974 F.2d 1340
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Jim M. BURGER, Plaintiff-Appellant,
v.
Michael RATTIGAN, a Hickory Hills police officer, Gerald
Mulack, a Hickory Hills police officer, and City
of Hickory Hills, a municipal
corporation, Defendants-Appellees.
 No. 91-3675.
 United States Court of Appeals, Seventh Circuit.
 Argued May 19, 1992.
Decided Aug. 25, 1992.
 
 Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 While driving his van home from work, Jim Burger was stopped by Hickory Hills, Illinois, police officer Michael Rattigan. Officer Rattigan was responding to an anonymous tip that a van matching Mr. Burger's was being driven recklessly and that the driver was throwing beer cans out of the window. Officer Rattigan conducted a limited search of Mr. Burger's van and told Mr. Burger to follow him to the police station, five blocks away, to post bond. Instead, Mr. Burger drove his van home, parked it in the driveway, and hid in his house. Officer Rattigan and Hickory Hills Police Corporal Gerald Mulack had the van towed and impounded. Mr. Burger later filed suit under 42 U.S.C. § 1983 against Officer Rattigan, Cpl. Mulack, and the City of Hickory Hills for violating his Fourth Amendment rights by stopping him, searching his van, placing him under arrest, and having the van towed, all without reasonable suspicion or probable cause. The district court denied the defendants' motion for summary judgment on the van-towing count, which was the only count involving Cpl. Mulack. The parties have since settled that claim. The district court granted defendants' motion for summary judgment on the remaining claims, and Mr. Burger appeals. For the following reasons, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 The following relevant facts are drawn from deposition excerpts submitted to the court in connection with the motion for summary judgment. On June 4, 1989, at approximately 8:00 p.m., a young man entered the Hickory Hills police station located at 8652 West 95th Street in Hickory Hills. The man told the police dispatcher, Steven Pryor, that he had just been driving eastbound on 95th Street and had observed a maroon van driving eastbound in front of him near the Saber Room, a banquet hall or entertainment facility located in the 9100 block of 95th Street (four and one-half blocks west of the police station). The man told Dispatcher Pryor that the van was being driven recklessly and that the driver was throwing beer cans out of the window. He also said that the van had diamond-shaped windows in the back. He did not tell Dispatcher Pryor his name or address.[1] As this unidentified man was talking with Dispatcher Pryor, Officer Rattigan entered the radio room and overheard the conversation. After hearing the complaint, Officer Rattigan told Dispatcher Pryor, "I'll go out there." Dispatcher Pryor dispatched the call over the police radio to Officer Rattigan and to another car driven by Officer Mark Jurak.
 
 
 4
 Officer Rattigan drove west on 95th Street to the Saber Room but did not see a maroon van on the way. He then pulled into the parking lot at the next intersection, 9200 West 95th Street. A moment later, Officer Jurak arrived and pulled his car alongside Officer Rattigans. The two police officers spoke briefly and concurred that the van had probably left the area in the five minutes that passed between the time the tipster last saw it and the time the officers were able to drive to the area. Officer Jurak drove away and, as Officer Rattigan was preparing to radio the station, the tipster pulled his car alongside Officer Rattigan's. Officer Rattigan recognized the man from seeing him in the radio room minutes before, but the man did not recognize Officer Rattigan. The man told Officer Rattigan that he had just been in the police station and had reported a drunken driver. He also said that the maroon van was being driven recklessly and had almost caused a traffic accident. Officer Rattigan told the man that he and Officer Jurak had just finished looking for the van and had concluded that it had left the area. The man told Officer Rattigan, "No, no. The van is down on 90th Avenue off of 95th Street." R.38 Ex.B at 31-32. Officer Rattigan then turned his squad car around and headed back east on 95th Street. In or near the 9000 block of 95th Street, he observed a maroon van ahead of him on 95th Street, also heading east. The van had diamond-shaped windows. Soon thereafter, Officer Jurak also spotted the van and positioned himself behind Officer Rattigan's car. According to their deposition testimony, for the next few blocks, Officer Rattigan and Officer Jurak saw the maroon van weave, cross the yellow line twice, and tailgate the car ahead of it.
 
 
 5
 According to his deposition testimony, Jim Burger was driving his maroon van home from work, eastbound on 95th Street in Hickory Hills, on June 4, 1989, at approximately 8:00 p.m. Approximately one-half block before reaching the Hickory Hills police station, Mr. Burger noticed two squad cars in the parking lot of the police station and two squad cars on the street adjacent to the police station. The squad cars were all inching forward towards 95th Street. As he passed the station, all the cars pulled out in a line behind his van.
 
 
 6
 The parties agree that Mr. Burger turned left off 95th Street onto 82nd Avenue (four blocks east of the police station). As Officer Rattigan was making the turn behind Mr. Burger, he flashed his lights and turned on his siren briefly. Mr. Burger pulled over. According to Officer Rattigan, while he was radioing the station to report the stop, Mr. Burger exited his van and approached Officer Rattigan's squad car. Officer Rattigan cut short his radio communication and stepped out of his squad car. According to Officer Rattigan, Mr. Burger then stepped up to him and said: "What the --- do you guys want now? You guys are always --- with me. I didn't do anything wrong." R.38 Ex.B at 68. Officer Rattigan testified that he smelled alcohol on Mr. Burger's breath. Officer Rattigan asked Mr. Burger for his driver's license. Mr. Burger handed Officer Rattigan a traffic ticket and said that his license had been taken by another Hickory Hills police officer two weeks ago, but that he was permitted to drive on a bond, of which the ticket was evidence. According to Officer Rattigan, he asked Mr. Burger if he had been drinking, and Mr. Burger replied, "I had a couple of beers." Id. at 73.
 
 
 7
 Officer Jurak approached and stood next to Officer Rattigan. According to his deposition testimony, Officer Jurak smelled beer on Mr. Burger's breath and saw that his eyes were red and bloodshot. Officer Rattigan then asked Mr. Burger if there was any open alcohol in the van, and Mr. Burger said, "No." Officer Rattigan told Mr. Burger to stay with Officer Jurak while he searched the van for open alcohol. Officer Rattigan then conducted what he termed a limited search of the van: he opened the door, stepped up on the running board, looked around, and saw, between the driver's seat and the passenger seat, a piece of cardboard with liquid spills on it. He reached over, retrieved the piece of cardboard, and smelled it. According to Officer Rattigan, "[i]t smelled just like beer. It was fresh and you couldn't miss it.... There was no doubt about it, no doubt in my mind that it was beer." Id. at 74. Officer Rattigan brought the cardboard back to where Mr. Burger and Officer Jurak were standing and asked Mr. Burger, "If you haven't been drinking in your van, then what's this?" Officer Rattigan could not recall Mr. Burger's response. According to Officer Jurak, however, Mr. Burger's response was: "I don't know. What is it?" Officer Rattigan then said, "I don't know. I'm asking you. It smells like beer." According to Officer Jurak, Mr. Burger replied, "Well, it can't be because I don't drink beer. It just can't be beer." R. 42 Ex. 2 at 31.
 
 
 8
 Mr. Burger then asked to be taken to the station to use the Breathalyzer machine to prove that he was not intoxicated. Officer Rattigan told Mr. Burger that, according to police procedure, they would first have to conduct a field sobriety test. Mr. Burger agreed: "Fine. I will take any test you want to give me. Just give me the test and I'll pass it." R.38 Ex.C at 78. Officer Rattigan instructed Mr. Burger to raise one foot about six inches off the ground, look at the raised foot, and start counting. Mr. Burger raised his foot and started to count loudly, but looked straight at Officer Rattigan rather than at his foot. Officer Rattigan told Mr. Burger to look at his foot, but, according to Officer Rattigan, Mr. Burger refused: "--- you. I am watching you." Id. at 81. Officer Rattigan walked to Mr. Burger's side, but Mr. Burger turned his head and continued to look Officer Rattigan in the eyes. Officer Rattigan continued around Mr. Burger and stopped directly behind him. At that point, Mr. Burger put his foot down and stopped counting. According to Officer Rattigan, Mr. Burger said, "--- you. I ain't taking anymore tests. Go ahead and arrest me." Id. at 82.
 
 
 9
 According to Officer Rattigan, "at that time, it was--you know--I had to make a decision to arrest him for drunk driving. I had to make that decision because he wouldn't perform any more tests." Id. It is not clear, however, whether Officer Rattigan arrested Mr. Burger for drunk driving. Officer Rattigan told Mr. Burger to get into his van and follow his squad car to the police station, which was five blocks away, in order to post bond for several traffic citations. Mr. Burger fled the scene.
 
 B. District Court Proceedings
 
 10
 On October 17, 1989, Mr. Burger filed suit against Officer Rattigan and the City of Hickory Hills under 42 U.S.C. § 1983, for alleged deprivations of his civil rights. Count I alleged that the defendants' actions in stopping him, placing him under arrest, and prosecuting him for the traffic violations and criminal violation violated his Fourth Amendment right to be free from unreasonable seizure and his Fourteenth Amendment right not to be deprived of liberty without due process of law. Count II alleged that Officer Rattigan's search of the van while it was stopped on 82nd Avenue violated his Fourth Amendment right to be free from unreasonable searches. Count IV[2] alleged that,
 
 
 11
 between January 1, 1989, and June 4, 1989, the plaintiff was stopped by various police officers of the City of Hickory Hills at least 10 times while he was driving his motor vehicle, and the police officers searched plaintiff's vehicle on each of the occasions and, finding nothing improper, released plaintiff without issuing any traffic citation or other complaint.
 
 
 12
 R. 19 at 6. These stops, Mr. Burger alleged, were so numerous and meritless as to constitute a custom or practice of the Hickory Hills police department to deprive him of his Fourth Amendment right to be free from unreasonable searches and seizures.
 
 
 13
 On December 21, 1990, the defendants moved for summary judgment. As to counts I and II, Officer Rattigan and Cpl. Mulack submitted that they were protected by qualified immunity under Anderson v. Creighton, 483 U.S. 635 (1987), Harlow v. Fitzgerald, 457 U.S. 800 (1982), and Rakovich v. Wade, 850 F.2d 1180 (7th Cir.) (en banc), cert. denied, 488 U.S. 968 (1988). With respect to count IV, the City contended that Mr. Burger had failed to establish a custom or policy under Monell v. Department of Social Services, 436 U.S. 658 (1978). In response, Mr. Burger stated that, with respect to each and every count in the complaint, there existed genuine issues of material fact.
 
 
 14
 On July 8, 1991, the district court granted the defendants' motion for summary judgment as to counts I, II, and IV. With respect to counts I and II, the court noted that, under Malley v. Briggs, 475 U.S. 335 (1986), the officers were entitled to qualified immunity if officers of reasonable competence could disagree on whether there was reasonable suspicion to stop the van or probable cause to search it or to arrest Mr. Burger. The court reasoned that, because the issue was whether a reasonable police officer in Officer Rattigan's position would have believed that he had reasonable suspicion or probable cause based upon the facts known to Officer Rattigan at the time, Mr. Burger's factual allegations were irrelevant. The court held that, based upon Officer Rattigan's testimony, Officer Rattigan could reasonably believe that he had reasonable suspicion to stop Mr. Burger and probable cause to search the van for open alcohol. With respect to count IV, the court ruled that Mr. Burger's assertion that he was stopped ten times was not supported with sufficient evidence to create a genuine issue as to whether the stops occurred or, if they did occur, whether they were without probable cause or in any way similar to the stop on June 4, 1989. Mr. Burger appeals the grant of summary judgment to the defendants on counts I, II, and IV.
 
 II
 ANALYSIS
 
 15
 We review de novo a district court's grant of summary judgment. Doe v. Allied-Signal, Inc., 925 F.2d 1007, 1008 (7th Cir.1991). We " 'must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion.' " Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir.1990) (quoting Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.1989)). While any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party, only reasonable inferences need be drawn. Hermes v. Hein, 742 F.2d 350, 353 (7th Cir.1984); Korf v. Ball State Univ., 726 F.2d 1222, 1226 (7th Cir.1984). Our task is to determine whether the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); see Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). "A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party." La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900, 905 (7th Cir.1990).
 
 A. Counts I & II: Stop, Search, and Arrest
 
 16
 Mr. Burger submits that, in response to the defendants' motion for summary judgment on counts I and II, he provided sufficient facts to establish a genuine issues of material fact whether Officer Rattigan had reasonable suspicion to stop him, probable cause to search his van, or probable cause to arrest him. In response, Officer Rattigan submits that the district court was correct to ignore Mr. Burger's version of events and to rely on Officer Rattigan and Officer Jurak's deposition testimony, because the qualified immunity analysis turns on the police officer's subjective view of the facts at the time of the incident.
 
 1. Qualified immunity standard
 
 17
 Even in the absence of valid reasonable suspicion to stop, probable cause to search, or probable cause to arrest, "qualified immunity provides officers with an additional layer of protection against civil liability." Hughes v. Meyer, 880 F.2d 967, 970 (7th Cir.1989) (collecting cases), cert. denied, 495 U.S. 931 (1990). Police officers are generally protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. at 639 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). Knowledge of a general right is not sufficient to invoke liability; "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). This test "focuses on the state of the law at the time of the alleged violation." Zook v. Brown, 748 F.2d 1161, 1164 (7th Cir.1984). This court has stated that the challenged action is judged by an objective standard: "what a reasonable officer would have believed under the circumstances, given the facts actually known to the arresting officer." Richardson v. Bonds, 860 F.2d 1427, 1431 (7th Cir.1988) (emphasis in original).
 
 2. Relevance of Mr. Burger's evidence
 
 18
 The defendants' motion for summary judgment on counts I and II relied upon the version of events Officer Rattigan relates in his deposition. In response to Officer Rattigan's motion for summary judgment, Mr. Burger invited the district court's attention to a copy of his verified amended complaint,[3] in which he stated that he "had not committed any traffic violation or any crime at said time and place." Officer Rattigan suggests that Mr. Burger's version of events is irrelevant because it is the facts known to the officer that determine his eligibility for qualified immunity. The district court agreed with Officer Rattigan, citing Richardson v. Bonds, 860 F.2d 1427, 1431 (7th Cir.1988).
 
 
 19
 In Richardson, we noted that, in the qualified immunity inquiry, the facts known to the objective "reasonable officer" are more important than what the officer believed to be the legal basis for the stop, search, or arrest:
 
 
 20
 The court apparently believed that [the officer's] subjective belief as to the legal basis for the arrest was relevant to the probable cause inquiry. While an arresting officer's subjective knowledge of facts sufficient to constitute probable cause is central to evaluation of the propriety of an arrest, we do not believe that the officer's view of the legal basis for the arrest is important.
 
 
 21
 Richardson, 860 F.2d at 1430 (emphasis in original). We then noted that it would be fruitless to debate the officer's beliefs, at the time of the arrest, as to the legal basis for the arrest:
 
 
 22
 Disputes about an arresting officer's actual state of mind at the time of the arrest would quickly resolve themselves into credibility battles, with each side presenting its own post hoc explanation of the officer's actions. If statements made by the officer at the time of the arrest were used as an indication of the offense for which the officer believed probable cause existed, officers could simply remain silent as to the basis for the arrest.
 
 
 23
 ....
 
 
 24
 [T]he question of an officer's actual justification for an arrest would rarely be capable of resolution at the summary judgment stage, but would ultimately become a credibility issue for the jury.
 
 
 25
 Id. (emphasis in original). In the present case, it appears that the district court misapprehended the holding of Richardson. The district court reasoned that, because we emphasized in Richardson the importance of the officer's actual knowledge of the facts, the plaintiff's version of those facts is irrelevant:
 
 
 26
 Burger's version of the arrest, or discrepancies in Rattigan's testimony regarding the arrest, are irrelevant if we find that a reasonable officer could conclude, based upon the facts known by Rattigan and Mulack, that probable cause existed for the search and seizure at issue here.
 
 
 27
 Memorandum Opinion and Order of July 8, 1991, (R.44) at 6.
 
 
 28
 However, Richardson and other Seventh Circuit cases on qualified immunity make it clear that the plaintiff's version of material facts is relevant; indeed, a defendant is not entitled to summary judgment on qualified immunity based upon facts about which there is a genuine dispute.[4] In Green v. Carlson, 826 F.2d 647, 652 (7th Cir.1987), we stated that "if there are issues of disputed fact upon which the question of immunity turns, ... the case must proceed to trial." In Apostol v. Landau, 957 F.2d 339, 342 (7th Cir.1992), we recently cited Green for the same proposition: "If there are issues of disputed fact upon which the question of immunity turns, ... the district court's grant of summary judgment in favor of the defendants was not proper." And, in Maust v. Headley, 959 F.2d 644, 649 (7th Cir.1992), we reiterated that, "[i]f there are issues of disputed fact upon which the question of immunity turns, ... summary judgment may not be granted."[5] Thus, the proper formulation of the qualified immunity inquiry is "whether, based on all the undisputed facts, the defendant's conduct violated any clearly established constitutional or statutory right." Green, 826 F.2d at 652 (emphasis added).
 
 3. The stop
 
 29
 In Terry v. Ohio, 392 U.S. 1, 21 (1968), the Supreme Court stated that a police officer can stop a pedestrian to ask him questions so long as the officer has "reasonable suspicion" of criminal conduct: "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" such a stop. This "reasonable suspicion" standard has also been applied to the police officer's authority to stop a moving vehicle. See United States v. Sharpe, 470 U.S. 675, 682-83 (1985); United States v. Cortez, 449 U.S. 411, 417 (1981); United States v. Somers, 950 F.2d 1279, 1283 (7th Cir.1991), cert. denied, 112 S.Ct. 1959 (1992); United States v. Randall, 947 F.2d 1314, 1318 (7th Cir.1991). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Cortez, 449 U.S. at 417. In determining whether the officer has reasonable suspicion, "the totality of the circumstances--the whole picture--must be taken into account." Id.
 
 
 30
 The most important fact in the reasonable suspicion inquiry is whether Officer Rattigan actually saw Mr. Burger weaving, crossing the yellow line, or tailgating. The evidence in favor of Officer Rattigan's version of events consists of the testimony of Officer Rattigan, the testimony of Officer Jurak, and the Dispatcher Pryor's statement that the tipster said he saw the van "driving recklessly." In rebuttal, Mr. Burger submitted his sworn statement that he "had not committed any traffic violation or any crime at said time and place," R. 42 Ex. 8 at 2. We assume, for purposes of argument, that Mr. Burger's simple statement is sufficient to create a genuine dispute as to whether Officer Rattigan actually saw Mr. Burger weaving, crossing the yellow line, or tailgating is in genuine dispute.
 
 
 31
 The next most significant fact in the reasonable suspicion inquiry is whether Officer Rattigan was aware that a young man entered the Hickory Hills police station and reported that he had seen a maroon van with diamond-shaped windows being driven recklessly near the Saber Room, in the 9100 block of 95th Street, and that the driver was throwing beer cans out of the window. The record contains Dispatcher Pryor's testimony, Officer Rattigan's testimony, and a photocopy of the complaint report filled out by Dispatcher Pryor. R. 42 Ex. 1. Mr. Burger suggests that the police officers fabricated this event, and that the anonymous complainant did not exist, but Mr. Burger can offer no evidence to support this suggestion. Thus, the fact that Officer Rattigan received a report of a maroon van being driven recklessly and of beer cans being thrown from the window is not in genuine dispute. For similar reasons, Mr. Burger cannot genuinely dispute that Officer Rattigan located him driving eastward on 95th Street in the maroon van with diamond-shaped windows.[6]
 
 
 32
 Thus, we limit ourselves to those facts which are clearly undisputed: the anonymous complaint and Officer Rattigan's identification of Mr. Burger's van matching the complainant's description and location.[7] The relevant issue is whether, considering the totality of the circumstances, a police officer with knowledge of these facts and those legal rules which were clearly established on June 4, 1989, could reasonably have thought he could stop the van without violating the driver's Fourth Amendment rights. At the time, the Supreme Court had not yet spoken on the question of when an anonymous tip would justify an investigatory stop. On January 16, 1990, the Supreme Court granted certiorari in Alabama v. White, 496 U.S. 325, 328 (1990), "[b]ecause of differing views in the state and federal courts over whether an anonymous tip may furnish reasonable suspicion for a stop." See also White v. United States, 454 U.S. 924 (1981) (Justice White, joined by Justices Brennan and Marshall, dissenting from denial of certiorari) ("Two Terms previous, I dissented from a denial of certiorari that left the state and lower federal courts in conflict and confusion over whether an anonymous tip may furnish reasonable suspicion for an investigatory detention. Jernigan v. Louisiana, 446 U.S. 958 (1980). Because it remains apparent that this difficult issue of everyday importance to law enforcement officials and citizens on the street alike requires resolution here, I am again moved to note my dissent."). The fact that there was sufficient conflict and confusion on the issue in January 1990 to cause the Court to grant certiorari in Alabama v. White reveals that, in June 1989, it was not clearly established whether an investigatory stop, based upon an anonymous tip of a reckless vehicle and police corroboration of the description and location of the vehicle, violated the "reasonable suspicion" standard required by Terry. For this reason, even assuming arguendo that Mr. Burger properly disputed the assertions that he was weaving, crossing the yellow line, and tailgating, he failed to create a genuine issue of fact sufficient to preclude the granting of summary judgment to Officer Rattigan on the investigatory stop.
 
 4. The search
 
 33
 Following a Terry stop, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief ... that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983). "If, while conducting a legitimate Terry search of the interior of the automobile, the officer should ... discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." Id. at 1050. However, absent a reasonable belief that the suspect may gain immediate control of weapons, there is no automatic right to search concomitant with a Terry stop. Id. at 1049 n. 14. In particular, such a search may not be justified by a desire to discover or preserve drugs. See Sibron v. New York, 392 U.S. 40, 64 & n. 21 (1968); United States v. Williams, 822 F.2d 1174, 1179 (D.C.Cir.1987). Rather, such a search requires either a warrant, consent to search, or probable cause to believe that the vehicle contains contraband. See California v. Carney, 471 U.S. 386, 392 (1985); Chamber v. Maroney, 399 U.S. 42 (1970). "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). As the Court noted in Brinegar, when courts attempt after the fact to distinguish between "mere suspicion and probable cause," the "line must necessarily be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." Id. at 176.
 
 
 34
 In addition to the undisputed facts of the anonymous tip that a reckless driver throwing beer cans out of the window, and Officer Rattigan's corroboration of the description and location of the van, several more facts are relevant to the determination whether Officer Rattigan is entitled to qualified immunity for searching Mr. Burger's van. Officer Rattigan stated that Mr. Burger, immediately after pulling over, got out of his van and approached Officer Rattigan's squad car. Mr. Burger does not dispute this. Officer Rattigan and Officer Jurak both stated that Mr. Burger was angry, used foul language, and spoke loudly. Mr. Burger does not dispute this. Both Officers Rattigan and Jurak stated that they smelled alcohol on Mr. Burger's breath. Mr. Burger does not dispute this.[8] Both Officer Rattigan and Officer Jurak state that they observed that Mr. Burger had red, bloodshot eyes. Mr. Burger does not dispute this.[9]
 
 
 35
 Thus, limiting ourselves to these undisputed facts, the relevant issue is whether, considering the totality of the circumstances, a police officer with knowledge of these facts and those legal rules which were clearly established on June 4, 1989, could reasonably have thought he could conduct a limited search of the van for open liquor containers without violating the driver's Fourth Amendment rights. Because Mr. Burger was away from the van and under the supervision of Officer Jurak, Officer Rattigan could not justify the search as attendant to the Terry stop upon reasonable belief that the Mr. Burger was dangerous and might gain immediate control of weapons. Nor did Officer Rattigan have a search warrant or, apparently, Mr. Burger's consent. Nonetheless, it was clearly established that a search was justified if Officer Rattigan had "probable cause to believe that the vehicle contained contraband." See California v. Carney, 471 U.S. 386, 392 (1985); Chamber v. Maroney, 399 U.S. 42 (1970). A reasonable officer with knowledge of the undisputed facts, including the anonymous tip that beer cans had been thrown out of the window of a van of the same description and in the same location, and Mr. Burger's defensive, angry, combative behavior and smell of alcohol, could reasonably have thought he had probable cause to believe that Mr. Burger had been driving with open containers of alcohol and that such containers, or evidence of them, still existed in the passenger compartment of the van. See Ill.Rev.Stat. ch. 95 1/2 p 11-502. An officer in Officer Rattigan's position, therefore, could have concluded reasonably that he could conduct a limited search of the passenger compartment of the van without violating Mr. Burger's Fourth Amendment rights.[10] Thus, Mr. Burger failed to create a genuine issue of fact sufficient to preclude the granting of summary judgment to Officer Rattigan on the limited search of the van.
 
 5. The arrest
 
 36
 Officer Rattigan stated that Mr. Burger asked to be taken to the station to use the Breathalyzer machine to prove that he was not intoxicated. Officer Rattigan told Mr. Burger that, according to police procedure, they would first have to conduct a field sobriety test. Mr. Burger agreed: "Fine. I will take any test you want to give me. Just give me the test and I'll pass it." R.38 Ex.C at 78. Officer Rattigan instructed Mr. Burger to raise one foot about six inches off the ground, look at the raised foot, and start counting. Mr. Burger raised his foot and started to count loudly, but looked straight at Officer Rattigan rather than at his foot. Officer Rattigan told Mr. Burger to look at his foot, but according to Officer Rattigan, Mr. Burger refused: "--- you. I am watching you." Id. at 81. Officer Rattigan walked to Mr. Burger's side, but Mr. Burger turned his head and continued to look Officer Rattigan in the eyes. Officer Rattigan continued around Mr. Burger and stopped directly behind him. At that point, Mr. Burger put his foot down and stopped counting. According to Officer Rattigan, Mr. Burger said, "--- you. I ain't taking anymore tests. Go ahead and arrest me." Id. at 82. Mr. Burger does not dispute any of these facts alleged by Officer Rattigan.[11]
 
 
 37
 It is not entirely clear that Officer Rattigan's investigatory stop of Mr. Burger ever ripened into an arrest. Compare Florida v. Royer, 460 U.S. 491, 502 (1983) (investigatory stop in airport lobby ripened into arrest by the time citizen was in police interrogation room and police had seized his ticket, identification, and luggage) with United States v. Boden, 854 F.2d 983, 991-93 (7th Cir.1988) (confrontation between BATF agents and suspect standing beside car never ripened into arrest because it was temporary and agents never transported suspect or even placed him into a vehicle). It might be argued that Mr. Burger consented to his detention when he asked to go to the station to take a Breathalyzer test, or when he said to Officer Rattigan, "Go ahead and arrest me." However, we assume for the sake of argument that Officer Rattigan's instruction to Mr. Burger to follow him to the station constituted an informal arrest. A warrantless arrest requires probable cause. See United States v. Watson, 423 U.S. 411, 423-24 (1976). Again, we note that probable cause exists "where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonable trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925). Therefore, the relevant issue is whether, considering the totality of the circumstances, a police officer with knowledge of the undisputed facts and those legal rules which were clearly established on June 4, 1989, could reasonably have thought he could arrest Mr. Burger without violating his Fourth Amendment rights.
 
 
 38
 At this point in the encounter, the undisputed facts include the anonymous tip of a reckless driver throwing beer cans out of the window, Officer Rattigan's corroboration of the description and location of the van, Mr. Burger's defensive, angry, combative behavior and smell of alcohol, and Mr. Burger's refusal to cooperate in the field sobriety test. These facts alone would "warrant a man of reasonable caution in the belief that' an offense has been or is being committed." That offense could either be driving while under the influence of alcohol, in violation of Ill.Rev.Stat. ch. 95 1/2 p 501, or resisting or obstructing a peace officer, a violation of Ill.Rev.Stat. ch. 38 p 31-1. Thus, a reasonable officer in Officer Rattigan's position could reasonably have thought that he could instruct Mr. Burger to follow him to the police station without violating Mr. Burger's Fourth Amendment rights.
 
 
 39
 Thus, while Mr. Burger's version of events is relevant to the qualified immunity inquiry, it fails to create a genuine issue of fact sufficient to preclude summary judgment in favor of Officer Rattigan on counts I and II.
 
 
 40
 B. Count IV: Custom or Practice of the City of Hickory Hills
 
 
 41
 In count IV of his amended complaint, Mr. Burger alleged:
 
 
 42
 3. That between January 1, 1989, and June 4, 1989, the plaintiff was stopped by various police officers of the City of Hickory Hills at least 10 times while he was driving his motor vehicle, and the police officers searched plaintiff's vehicle on each of the occasions and, finding nothing improper, released plaintiff without issuing any traffic citation or other complaint.
 
 
 43
 4. That on each of the said occasions, plaintiff was not violating any rule of the road or violating any other law and the police officers did not have any probable cause to stop plaintiff and search his vehicle.
 
 
 44
 R. 19 at 6. Mr. Burger further alleged that the unjustified stops had become so frequent "as to form a custom and practice in the Hickory Hills police department so as to constitute the act of the City of Hickory Hills." Id. at 7. By way of relief, Mr. Burger sought "a temporary and permanent restraining order against the Hickory Hills police department from stopping and searching plaintiff's vehicle where there is no probable cause to believe a traffic or other violation has been committed by plaintiff." Id.
 
 
 45
 In its motion for summary judgment, the City noted that Mr. Burger had admitted in his deposition, which was taken on July 17, 1990, that the Hickory Hills police department had stopped him only once since June 4, 1989, and that stop was to give Mr. Burger a warning for driving without a headlight. The City further argued that "plaintiff has failed to produce any evidence that a policy or custom exists within the City of Hickory Hills Police Department encouraging its officers to stop and/or arrest the plaintiff without probable cause." R. 38 at 10. The City contended that Mr. Burger had thus failed to produce sufficient evidence to support municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). In response, Mr. Burger invited the court's attention to the above-quoted allegations in his verified amended complaint. The district court reasoned that "Burger's allegations do not support an inference of an official policy because Burger has not submitted any evidence that any of the stops prior to June 4 [1989] were without probable cause. Therefore, Burger has not established that those prior stops were either illegal or similar to the arrest on June 4." R. 44 at 10.
 
 
 46
 On appeal, Mr. Burger admits that he did not provide any additional evidence in response to the motion for summary judgment but argues that "[w]here the movant for summary judgment presents no evidentiary matter on an issue, the party answering need not present any rebutting evidence but may rely on his pleadings." Appellant's Br. at 19. Mr. Burger misstates the evidentiary burdens of summary judgment. The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see id. at 325 ("the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. Id. at 324. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. Id. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
 
 
 47
 A non-moving party with the burden of proof on an issue must "set forth specific facts" demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(c). "Conclusory allegations that have no factual support are insufficient to create a genuine issue of material fact." Powers v. Dole, 782 F.2d 689, 695 (7th Cir.1986). Mr. Burger had the burden of proving that the City of Hickory Hills had a policy or custom of stopping his van and searching it without reasonable suspicion or probable cause. Thus, in its motion for summary judgment, the City needed only to "point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. This sufficed to shift to Mr. Burger the burden of establishing that a genuine issue of material fact existed whether the City of Hickory Hills had such a policy or custom. Mr. Burger's response was simply to point to his sworn statement that Hickory Hills police officers stopped him more than ten times without probable cause or reasonable suspicion. As the district court noted, this statement was not sufficiently specific to create an issue of fact whether any stops prior to June 4 were without probable cause or similar to the arrest on June 4.[12] Mr. Burger failed to provide any specific facts about the prior stops.[13] Thus, we conclude that Mr. Burger's reference to the vague, conclusory allegations in his verified complaint did not suffice to discharge his burden of establishing that a genuine issue of material fact existed whether the City of Hickory Hills had a policy or custom of violating his constitutional rights.
 
 Conclusion
 
 48
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 At deposition, Dispatcher Pryor stated that the man probably refused to give his identity, "because I'm sure I asked." R. 38 Ex.A at 20
 
 
 [2]
 As noted, Count III was settled by the parties and is not relevant to this appeal
 
 
 [3]
 When a plaintiff properly invites the court's attention to particular facts alleged in a verified complaint, it can be the functional equivalent of an affidavit for purposes of summary judgment. See Williams v. Adams, 935 F.2d 960, 961 (8th Cir.1991); Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir.1991)
 
 
 [4]
 Richardson, for example, turned on whether there was a genuine issue of fact as to what the officer knew. This was resolved in favor of the officer because the plaintiff admitted the relevant fact in a deposition. 860 F.2d at 1433
 
 
 [5]
 Indeed, the same standards regarding questions of fact apply in all summary judgment cases, whether or not the basis for the motion is qualified immunity:
 The Supreme Court clearly has envisioned that the issue of qualified immunity may arise in the context of a summary judgment motion, and has given no indication that the district court ruling on a motion for summary judgment on grounds of qualified immunity should follow a different procedure than if summary judgment had been requested on other grounds.
 Green, 826 F.2d at 651.
 
 
 [6]
 We also note that the record does not establish whether Officer Rattigan knew that the report was anonymous. In his deposition, he states that he did not know whether it was anonymous and acknowledges that anonymous reports are received by the police with some regularity. He offers no evidence as to whether the radio transmission identified the report as anonymous or whether it was the usual practice of a dispatcher to identify the report as anonymous. Cf. United States v. Hensley, 469 U.S. 221, 232 (1985) (officer would be immune in civil suit for good faith reliance on information received in radio dispatch). The situation is rendered more ambiguous because Officer Rattigan was present when the tipster made his report. While Officer Rattigan testified that he entered the radio room while the conversation between the tipster and Dispatcher Pryor was underway, Dispatcher Pryor testified that Officer Rattigan was present throughout the encounter. The defendants' statement of uncontested facts, although ambiguous, can be read to support Dispatcher Pryor's version. Under these circumstances, we must assume, for purposes of this appeal, that Officer Rattigan took action on the basis of what he understood to be an anonymous report
 
 
 [7]
 We also note the fact that the witness reported to the police in person rather than over the phone. This adds a slight amount of reliability to the report, because a malicious tipster runs a greater risk of adverse consequences by reporting face-to-face to the police. See Adams v. Williams, 407 U.S. 143, 146-47 & n. 2 (1972); United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir.1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."), cert. denied, 112 S.Ct. 1975 (1992); United States v. Sierra-Hernandez, 581 F.2d 760, 763 (9th Cir.), cert. denied, 439 U.S. 936 (1978). But see Salazar, 945 F.2d at 53 (Oakes, C.J., dissenting) ("[T]he agents here did not know the identity of the tipster and there was no indication that the agents ever would have any further contact with him. Whether an anonymous tip is delivered in person or over the telephone wires has little if any impact on the reliability of the tip. Whereas, whether the police will have future dealings with the tipster, and thus whether the tipster has a stake in the veracity of the information, is a true gauge of reliability.")
 
 
 [8]
 In Mr. Burger's responding brief, which is not a verified document as was his amended complaint, he states that he had not had any alcohol to drink on the day of the incident. However, Mr. Burger does not support this statement with any factual reference. Nowhere in his amended complaint or in the three pages of his deposition that he submitted in opposition to summary judgment does Mr. Burger state that he had not been drinking on that day. Thus, Mr. Burger failed adequately to dispute this fact
 
 
 [9]
 According to Officer Rattigan, he asked Mr. Burger if he had been drinking, and Mr. Burger replied, "I had a couple of beers." R. 38 Ex.B at 73. Mr. Burger does not directly dispute this, but points to Officer Jurak's statement that, in response to later inquiry about the wet cardboard, which Officer Rattigan claimed smelled of beer, Mr. Burger said, "Well, it can't be because I don't drink beer. It just can't be beer." R. 42 Ex. 2 at 31. This does not squarely dispute that Mr. Burger had said to Officer Rattigan, "I had a couple of beers."
 
 
 [10]
 Indeed, if we were to consider the statement "I had a couple of beers," see n. 9, the evidence would be not just sufficient, but overwhelming
 
 
 [11]
 Officer Rattigan found, next to the driver's seat in Mr. Burger's van, a piece of cardboard with a wet spot. Mr. Burger does not dispute this. Officer Rattigan stated that the wet spot smelled distinctly of beer. Mr. Burger disputes that the wet spot was beer by pointing to Officer Jurak's testimony that he heard Mr. Burger say "Well, it can't be because I don't drink beer. It just can't be beer." R. 42 Ex. 2 at 31. While this is not a square denial that the cardboard smelled of beer, we shall assume for present purposes that Mr. Burger's remark was sufficient to place the fact in issue
 
 
 [12]
 We note that evidence of a conspiracy among an isolated group of officers would not suffice. To survive the City's summary judgment motion on this count, Mr. Burger would have to allege, and support with specific facts, either that City policymakers had instituted a policy of harassing him or that they had acquiesced in such harassment becoming a "longstanding practice or custom which constitutes the 'standard operating procedure' " of the City of Hickory Hills. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 485 (White, J., concurring)). Compare Sims v. Mulcahy, 902 F.2d 524, 542-43 (7th Cir.) (suggesting that evidence of a widespread practice of unauthorized and unconstitutional entry by police officers into residential homes could suffice), cert. denied, 111 S.Ct. 249 (1990), with Lenard v. Argento, 699 F.2d 874, 885-87 (7th Cir.) (holding that, despite jury finding of conspiracy among police officers to deprive plaintiff of his civil rights, evidence was insufficient to justify imposition of municipal liability under Monell ), cert. denied, 464 U.S. 815 (1983)
 
 
 [13]
 At oral argument, Mr. Burger suggested that he identified details of several of these stops at his deposition. If so, then Mr. Burger could simply have submitted to the court portions of the deposition transcript along with references in his memorandum to guide the court's attention to the relevant facts